Good morning, your honors. May it please the court. The district court in this case correctly found that the Illinois Supreme Court unreasonably applied Chambers v. Mississippi and Williamson v. United States when it upheld the exclusion of Vicki Iacullo's police statements that were reliable, corroborated, and incriminating and that were critical to support Fidel Caffey's testimony and his steadfast assertion of innocence that he was not part of Annette Williams' plan to fake a pregnancy, kidnap a baby, and claim that baby as hers and Caffey's. These statements were incriminating. When Vicki Iacullo made them, she knew that Annette Williams and Fidel Caffey had been arrested for murder and kidnapping. She admitted to being in possession of the baby and a grambling tiger's jacket that had been taken from the Evans apartment. She admitted to the police that she presented that baby to Fidel Caffey and told him that he was the father. She admitted that she gave him the grambling tiger's jacket as a new father present and she also admitted that she prepared fake birth certificates at Annette Williams' request and presented them and gave them to Annette Williams outside of Caffey's presence. Those statements incriminated her on a crime of obstruction of justice but not of the murder. I would disagree with that Your Honor. The prosecutor throughout the pretrial proceedings indicated that they could charge Vicki Iacullo. They continuously threatened to charge her with first degree murder and their threat to charge her with first degree murder was predicated on those statements. And even if all they could do, and ultimately all they did was charge her with obstruction of justice, but they continuously called her a co-defendant and they said that they could charge her with first degree murder, they said they had a tremendous amount of evidence to charge her with first degree murder. Well sure, she's clearly implicated in the plot. There's plenty of evidence for that but there's no evidence placing her at the scene of the murders at the Addison apartment or where the little boy was killed. She wasn't involved at all where the little boy was killed, that's correct Your Honor. But in order to be admissible under Chambers, the statements have to be incriminating such that a reasonable person would be aware that the disclosure of these statements would subject her to possible criminal prosecution. But in this case, what she's telling the police at these various junctures is somewhat changeable and also, you know, change tactical admissions. Well first of all, it's not changeable. During the pretrial proceedings, the prosecution never indicated that she made any inconsistent statements with respect to these particular events that occurred. Presenting Kathy with the baby, giving him the jacket, creating the birth certificates. And in addition, they were incriminating in the sense that they weren't tactical admissions. When she made the statements to the police, she knew about the arrest of Kathy and Williams. She knew that they had been charged with murder and kidnapping. Had she wanted to make tactical admissions, what she would have said to reduce her risk of prosecution was something like, Fidel, Kathy, and Annette Williams came to my house. That's the state's theory of the case. That's not what she said. She could have said, when Annette Williams and I went to Kathy's house, it was Annette Williams that presented the baby to Kathy. She could have said it was Annette Williams that gave the jacket to Fidel, Kathy. She didn't say that. She said she did all these things. So there was no indication in these statements that she was trying to reduce her risk of prosecution and she knew full well that she could be prosecuted. In fact, when she made the statements, first of all, they were recorded so she knew she couldn't deny them later. And she was Mirandized, so she knew that making these statements could lead to possible criminal charges against her. What Chambers requires is that the court look at the surrounding circumstances to determine whether or not the statements were made under reliable circumstances. And in this case, the Illinois Supreme Court unreasonably failed to look at the surrounding circumstances and failed to view the statements in the context in which they were made when it determined that the statements were not incriminating. Also, the Illinois Supreme Court never determined whether or not these statements were critical to the defense. And they were critical to the defense because the success of Fidel, Kathy's defense depended upon the jury believing his testimony about how he learned about the baby and obtained that jacket. And the only and the best corroboration for that defense was Vicki Iacullo's statements. Furthermore, they were critical to the defense because they directly contradicted the state's theory of guilt, which is another thing that the Illinois Supreme Court failed to consider. The state's theory of guilt was that Annette Williams and Fidel Kathy had a game plan from the very beginning that their game plan was to fake the pregnancy and kidnap this baby. These statements directly contradict that because these statements show that Fidel Kathy was not part of Annette Williams' game plan. Rather, Vicki Iacullo was in that game, was part of that game plan. Where the district court went wrong in this case was when the jury did not affect the verdict. This court should apply the Brecht standard to determine whether or not the exclusion of the evidence had a substantial or injurious effect on the jury's verdict. And the best evidence of whether these statements had an effect on the jury's verdict is the prosecution's closing argument. And I strongly urge this court to look carefully at the prosecution's closing argument. Their closing argument was, they began the closing argument with, the overwhelming evidence of guilt is Fidel Kathy's wearing the jacket when he was arrested. That was the overwhelming evidence of guilt and Vicki Iacullo's statements would have directly contradicted that argument to the jury because they show that she was the one that gave Kathy the jacket. He didn't take it from the Evans apartment. Their closing argument was riddled with, and actually the theme of the entire closing argument was, jury convict Kathy because his testimony is absurd and ridiculous because it's not corroborated. Their theme of the closing argument... Does this have any effect with the materiality of the evidence? Well, it's combined, yes. The materiality, under Chambers you look to see whether the statements were reliable and trustworthy and incriminating and then you also look to whether they were critical to the defense. And they were critical to defense because they would have supported Kathy's testimony, the best and only evidence that would have supported his theory of defense, and they would have contradicted the state's theory of guilt. For the same reasons, those statements were also, the exclusion of the The state's theory of guilt was not just this faked pregnancy theory. I mean, they had witnesses placing him at the scene of the murders and actually carrying out the murder of Joshua. Yes, and again, I would urge this court to look closely at the state's closing argument and to view, and to look at its perspective on the credibility of the witness. They had an eyewitness that did place, she claimed that she saw Kathy stab Joshua the next day. And she also claimed that Joshua said that Fidel was one of the burglars that came into his house. The state had no faith in Patrice Scott's testimony whatsoever. They did not rely upon her testimony during the closing arguments. As I said, they began their closing argument with the overwhelming evidence of guilt is not our eyewitness who identified Kathy stabbing Joshua. They said our overwhelming evidence of guilt is the jacket. And they, if you look at Patrice Scott's testimony, it was highly inconsistent with respect to the events that she supposedly witnessed. She made statements to the police, numerous statements to the police, in which she did not tell the police that Kathy was the one that stabbed Joshua, nor did she tell the police that Joshua was the one that named, that Joshua named Fidel as one of the burglars. Right, that all came out later, but that's not at all unusual in developing homicide investigation, where witnesses will tell only part of the story and then cough up the rest of it later. Well, she was under suspicion herself of being involved in Joshua's murder. In fact, she was Red Miranda. Right, and she's got to be worried about that herself, because she's witnessing all this stuff and isn't doing anything about it. But this is, again, not at all uncommon in homicide cases, where the witnesses are themselves tainted by all kinds of problems. Well, and she was so tainted by problems, after the defense counsel... And all that came out on cross-examination. It did, and then... She stuck by her testimony, and Pruitt stuck by his testimony about having overheard Joshua name the burglars. Correct, and after the defense counsel in his closing argument made a blistering attack on the credibility of Patrice Scott, ASA Consell in rebuttal closing argument made no effort to rehabilitate her. Again, he just returned to the theme of jury convict Caffey, because his ridiculous testimony is uncorroborated. Don't take his testimony. Undiscredited witness. The prosecution would have relied upon her during closing argument, and I think the best evidence that the prosecution did not believe... Plenty worried that the jury was going to believe Caffey's plausible explanation for the events over that two-day period. And instead of relying upon the strength of their own case, they relied upon the weakness of the defense case in order to get this conviction, and that is evidence in the closing arguments. And furthermore, Patrice Scott's testimony was quite implausible when looked at. She claimed that after Caffey and Annette Williams stabbed Joshua, all three of them drove to Maywood, and then that's where the body was placed. And then Fidel Caffey got out of the car. That makes no sense. At that point in time, the baby that, according to the state's theory, Fidel Caffey was desperate to have, would have been left alone in the Caffey-Williams townhouse for hours. And Caffey would have no way back from Maywood to where they lived in Schaumburg. Now, the prosecution said they placed his body there because Caffey's familiar with the area. Well, that would be just the opposite reason to go there. Maywood was riddled. He knew police officers there. He knew his crime and leave his body here when there would be possibly witnesses there to this. And then he had no way home because the evidence is undisputed that Patrice Scott and Annette Williams went back to Patrice Scott's house, and Fidel Caffey was not with them afterwards. And Patrice Scott helped Annette Williams to clean the car. So much of Patrice Scott's story is plausible and indicates that she was covering up for her own actions in not attempting to save Joshua. In fact, again, looking at the closing arguments, ASA Kinsella, in order to try to rehabilitate Dwight Pruitt, said, well, look at his testimony. He felt sorry for Joshua, and he feels bad that he did nothing to try to save Joshua. ASA Kinsella did not say anything like that related to Patrice Scott. I think this test, I think this evidence, I think this record, and in order to assess the chamber's violation, this court has to look at the entire record. Right, and there's another witness, Joy Wilson, who places Caffey against Steve. She was one of the witnesses that, again, the district court judge relied upon to say that the evidence was substantial. Every single witness in this case, Patrice Scott, Dwight Pruitt, Joy Wilson, Muhammad Sidique, Tenny Clay, every single witness failed to implicate Caffey when first, in this high profile case, when the police first spoke to them. They didn't implicate Caffey until they were re-interviewed or at the trial, and Joy Wilson is an example of that. In her first two interviews with the police, one of which was taped, she never said that Fidel Caffey was in that car, that Ward went into. And then at the grand jury, she said, she was shown a picture of Caffey and she said, yeah, I recognize him as being a friend of my uncle. Well, if she recognized Caffey, why didn't she tell the police in her first two interviews that Caffey was in that car? Again, in this high profile case, witnesses' statements changed as the case went on. And then also she claimed, this is implausible, she's 15 years old, she claimed that the driver of the car asked for her phone number. And that if indeed Ward went into this car, occupied by Caffey and Williams, where was the baby and Joshua? At that time, the baby and Joshua, she never said that the baby or Joshua were in the car. One example of witnesses who changed their stories as the case went on. Fidel Caffey has steadfastly maintained his innocence. He's consistently explained his version of the events. I don't think he has an explanation for the phone call to the friend before the murders that he and Annette were having their baby that night. That was Cassandra Jenner, the drug addict who bought drugs from Caffey, who did not, yes, his explanation was, I didn't tell her that we were about to have a baby. Our phone call had to do with drugs that I sold her earlier, and she paid me with a bounced check, and indeed that bounced check was found in the glove compartment of his car. He had an explanation for every single piece of evidence, including Mohammed Sadiqui, that's the 7-11 clerk who said that he bought baby wipes at 1-30, and 1-30 is a critical time because that would have been before Caffey said that he first learned of the baby. Caffey did go to the 7-11, but he bought baby wipes at 4-30, and also Sadiqui is another example of a witness who, when first spoke to the police, did not give the police, did not immediately implicate Caffey. Counselor, your time has expired. I'll give you two minutes. Thank you. May it please the Court, Counsel. My name is Leah Bendick from the Illinois Attorney General's Office on behalf of Respondent. This Court should affirm the District Court's judgment rejecting habeas. Counsel, would you pull the microphone toward you or keep your voice up? Yes. Sorry about that, Your Honor. This Court should affirm the judgment of the District Court that rejected habeas relief here, and focusing on the first claim about the Chambers violation alleged as to the exclusion of the multiple hearsay statements by Vicki Iacullo to police, this Court should affirm the District Court's ultimate rejection of habeas relief for that claim, either because the Illinois Supreme Court reasonably applied Chambers v. Mississippi, or because, in the alternative, any error was harmless. Now, in addition to the ordinary deference owed on any habeas review, there are two additional reasons why a Chambers claim in particular is difficult for a petitioner to succeed upon. The first is the very narrow and fact-specific nature of the Chambers holding, and the second is the fact that it employs a multi-factor test. To explain, the concluding paragraph of Chambers is very noteworthy. It contains the holding, and it is very careful, the Court was very careful to note that under the facts and circumstances of that case, it was finding the combination of four evidentiary rulings constituted a due process violation. And indeed, that was the combination of restriction of the defendant in cross-examining a man named McDonald, who defendant theorized was the true murderer in that case, as well as the exclusion of three hearsay statements. Subsequent U.S. Supreme Court cases, including Egelhoff and Jackson, have stressed that Chambers is a case-specific example of error correction, and that there rarely is a due process violation in this context. Now, this is important as well in a habeas case, because after all, that means that the facts must either be very similar or perhaps even identical to those in Chambers to warrant a due process violation habeas relief. So that's a position that for a Chambers violation, there has to be a full confession? Perhaps exonerating, yes, arguably. After all, the U.S. Supreme Court in the Sheffer case clarified that this meeting of critical evidence was the exclusion of evidence that quote, significantly undermined the fundamental elements of defendant's defense. So partially incriminating or modestly incriminating or hedgingly incriminating statements don't count. Well, it's hard to know exactly where the line would be drawn, but it is important to contrast the hearsay statements in Chambers against the ones here. After all, they really were confessions by another man for a crime that was committed by a sole perpetrator. That is in marked contrast to what we have here. After all, yes, there were multiple hearsay statements, but the nature of these crimes is that they were committed by multiple persons. No matter how guilty Vicki Iaculla might have been here, that does not automatically exclude petitioner as also being an active participant. That is a point that both the Illinois Supreme Court emphasized as well as the District Court here. And that is why the hearsay statements here are notably different than the ones in Chambers. It is also important to note that in discussing the hearsay statements, the U.S. Supreme Court noted that yes, ordinarily state courts are entitled to enforce evidentiary rules such as the hearsay rule. But if the statements are reliable and critical, then yes, perhaps there is a narrow exception. And in discussing reliability, discussed four factors. And that is important because here petitioner and the District Court find fault only with a single Chambers factor, the third factor. And this court, in the analogous case of Etherly v. Davis, a 2010 habeas case, looked at a petitioner's claim that a juvenile confession was involuntary, and the voluntariness of confessions is also a multi-factor test. In Etherly, this court held that the Illinois court had erred in applying one of those factors. But still this court held that that was insufficient to constitute an unreasonable application within the meaning of 2254D. And for good reason. One can imagine that the more complex a constitutional analysis, the fact that perhaps the state court errs in one isolated component of that test should not automatically justify a finding of an unreasonable application within the meaning of 2254D. And that is a point the District Court overlooked here. Because after all, the District Court only found that the Illinois Supreme Court misapplied the third Chambers factor. And in doing so, automatically concluded that that constituted an unreasonable application of Chambers. That's erroneous under Etherly. And also shows a more general point that since petitioner is really only disputing a single factor, his burden of showing that that alone should constitute a potential basis for habeas relief is all the more difficult. Was one of the working theories here early in this investigation that Vicki Iaculla was the intended recipient of the baby that Laverne Ward wanted Evans dead, but because she was pregnant, Vicki Iaculla wanted the baby and was willing to pay for it? I am unaware of that, Your Honor. I can't speak to that, I'm afraid. I'm sorry. There's some evidence about a meeting sometime before the crimes where Vicki Iaculla is present with her boyfriend and there's a conversation about Ward wanting Evans dead and what to do about the baby. And somebody says something about they've got the money. Well, I mean, it's also true we have the testimony of Dawn Colleen, who was at, she's the one who's going to borrow a vacuum or something like that. Right, that's what she said. And she was at the former residence of Williams and petitioner. And she states that Ward, in that moment, she heard Ward, petitioner, and Williams discussing do they still want the baby? And Iaculla was not alleged to be present there. So that at least shows that, I mean, it's hard to say. There could be many theories at the early stages. So she's not the bottle blonde present on the couch in that room? Or am I misremembering? I may be misremembering something. I have to admit that There's some unidentified bottle blonde that she says was there. Well, I don't know. And having only seen Iaculla when she testified two years ago at the evidentiary hearing, she was not blonde on that day. But perhaps that does not answer your question. That's all I can speak to on that, perhaps. But even so, again, it is important that no matter how guilty Iaculla may have been, that does not mean that petitioner was not in the participant and was not appropriately convicted of murder and kidnapping in this case. And after all, petitioner's theory here for why the Illinois Supreme Court unreasonably applied chambers in part argues that these statements constituted admissions, that she was accountable for murder and kidnapping. And that is simply inaccurate under Illinois law, because after all accountability in Illinois turns on a question of timing. When was the aid provided? If only after the crimes are complete, then that is only obstruction of justice. Right. But there's other evidence about her that forms the basis of the ineffective assistance of counsel claim stuff that she said to witnesses before the crime about obtaining a gun, how to get fingerprints off a gun, how to get powder burns off your hands. All of that was omitted by counsel after having been declared admissible by the trial court. That's true. That's right. So, I mean, there is some aiding and abetting evidence here. That even if Iaculla gave the gun that was used to kill Deborah Evans to the co-defendants here, we don't know that she knew what the gun was going to be used for. We don't know that she knew about the plot to steal the baby. We don't know, maybe since it was her gun, yes, she didn't want her fingerprints on a gun that she was given to people when she didn't know what was going to be used for what took place here. And in any case, what we're looking at in the first claim is the actual reliability of these discrete statements. And these discrete statements do not explain when the false birth certificate was created and do not explain whether Iaculla, when she prepared the birth certificate, whether she knew the true origins of the baby, because after all, Williams told everyone, including her family, that she was pregnant. We do not know that Iaculla did not know that baby Elijah was Deborah Evans' baby rather than Williams' baby at the time. It's suggestive of some complicity before the crime, at least in the planning. I mean, you can't place her at the scene, but... Possibly. The Illinois Supreme Court, again, said it was somewhat incriminating. The Illinois Supreme Court did conclude that. But it is important, again, to remember that this is one factor of four factors that only go towards reliability, which is only one component because critical... It is important, too, that the evidence is critical to the defense. So because of the fact that Iaculla may... It is unclear the degree to which Iaculla is guilty. It is important to remember that, again, that does not exclude petitioner from being an active participant. After all, again, it is important that... I apologize. I just want to emphasize that the District Court, in considering the surrounding circumstances of the crime, were considering this only through the perspective of an innocent Iaculla, saying that she would not have made these statements associating herself with these suspected murders unless that were true, but that would only be true if Iaculla were innocent. Again, okay, say for the moment that Iaculla were more guilty, perhaps through accountability or as an active participant. If that were true, the fact that she made these statements that implies that she was unaware and uninvolved until Williams showed up at her residence with the baby would be calculated to reduce her potential incrimination because, again, it's only potentially for obstruction of justice. And that is why, since the District Court based its disagreement with the Illinois Supreme Court's conclusion on looking at these surrounding circumstances, the surrounding circumstances are ambiguous. Yes, and perhaps an innocent person would not have made these unless they were reliable, but a guilty person would have calculated and made these false statements in order to reduce her potential for incrimination. And again, a final point that's worth noting is that chambers stressed, even in this concluding paragraph, that state courts are entirely authorized to have evidentiary rules, such as the hearsay rule, that may exclude favorable evidence. And in carving out... Does the record indicate whether Iaculla knew what the police knew when she made these statements? I'm afraid I don't know. Well, apparently there is evidence in the record that she had made statements before the killing, made inquiries before the killing, things of that nature. Were the police aware of those when they interviewed her, or was she aware that the police knew about those statements? I'm afraid I just simply don't know the answer to that under the record that we have before this court. It is clear that Iaculla knew that Petitioner and Williams had been arrested at the time she made this statement, but that's as far as I can go as confirming how much she knew about what the police suspected at the time that she made these statements. I see. Thank you. And so really, to turn to this final point again, chambers based its narrow exception for the ordinary application of a hearsay rule on the fact that evidence be both critical and reliable. And what's noteworthy is that under Petitioner's theory of the case, Iaculla was an active and involved participant. But again, these statements imply that she was completely unaware and uninvolved until the baby arrived at her house on the early morning hours of November 17th. In other words, Petitioner himself believes that these statements are partially unreliable, so he should not be entitled to use chambers to seek to admit hearsay statements that would be otherwise inadmissible under appropriate hearsay rules under chambers when he himself does not think that they completely satisfy what chambers requires. And again, alternatively, even if this court ultimately agrees with the district court that there is an unreasonable application of chambers, any error is harmless under the Brecht standard. In light of the compelling evidence of guilt described at pages 34 through 37 of the Appellee's Yes, Patrice Scott testified about what Joshua said, naming the burglars and naming Fidel as one of those burglars who cut his mother and sister. But it is important to note that yes, there's Patrice Scott, there's Dwight Pruitt, Cassandra Turner, Joy Wilson, and Mohammed Siddiqui. That is five witnesses who all testified about components of the timeline of this crime in a way that was consistent with the state's case and contradicted defendant's theory of innocence and contradicted his alibi. Now petitioner attempts to chip away at the credibility of each of them, but these are all points that were presented to the jury. And they're all points that pale in comparison to the fact that since there are five of them, they each make substantially more believable, each as individuals, because again, they are all consistent with the state's theory of the case. And if there are no further questions on the first claim, or I would like to make just a very brief note about the fourth claim, the Brady claim, and that is that this court should... It's starting to run out of time. Yes, I'll be very, very quick, Your Honor. I would just like to invite this court to consider whether the district court erred in declining to enforce the procedural default, because after all, this court in Tompkins has already acknowledged that non-compliance with section 122-2 of the Illinois Post-Conviction Hearing Act is an adequate basis under the independent and adequate state ground doctrine for habeas review. The district court's disagreement with that point only turns on an interpretation of this state statute, which is an inappropriate basis as a habeas court to decline to enforce a default. And so if there are no further questions from this court, I would ask again that the district court judgment be affirmed. Thank you. Thank you, Your Honor. Just briefly, what the state court did below and what the respondent is doing now in their argument is requesting that this court take a technical and mechanical application of the evidentiary rules, and that's exactly what you're not supposed to do under Chambers. And their technical, mechanical application of the hearsay rules denied Fidel Caffey his fundamental right to present a defense, evidence that was critical to support his theory of the defense. When you mechanically apply the hearsay rules and then the prosecution unfairly exploits their advantage by urging the convict based upon the absence of evidence, that is unfair play, and that's exactly what happened in this case. Mr. Caffey would urge that this court grants the writ. Thank you, counsel. Counsel, you took this case by appointment, did you not? Yes. You have the sincere thanks to the court for taking this very difficult case. Thank you. Appreciate both counsel argument this morning and we'll move to the third case.